IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **CAPITALPLUS CONSTRUCTION SERVICES LLC**, *et al.*, | : :  :  |
| **Plaintiffs,** | : **Case No. 2:20-cv-5932** : |
| v. | : **CHIEF JUDGE ALGENON L. MARBLEY** : : **Magistrate Judge Kimberly A. Jolson** |
| **JOHN W. DANFORTH COMPANY**, *et al.*, | : : : |
| **Defendants.** | : : |

## OPINION & ORDER

This matter comes before the Court on Defendants' Partial Motion to Dismiss. (ECF No. 16).[1] For the reasons that follow, the Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED**. The Motion to Dismiss filed prior to Plaintiffs' Amended Complaint (ECF No. 13) is **DISMISSED AS MOOT**.

### I. BACKGROUND

This case arises out of a major construction project called Project Mustang. Plaintiffs CapitalPlus Construction Services LLC ("CapPlus Construction"), CapitalPlus Financial LLC ("CapPlus Financial") (jointly, "CapPlus"), and Bruner Holdings LLC ("Bruner Holdings") filed this suit against Defendants John W. Danforth Company, Inc. ("JWDC"), Bruner Mechanical Team LLC ("BMT"), and Kirk Williams Company, Inc. ("KWC") on November 18, 2020. (ECF No. 1). The central player, however, is Bruner Corp.—which is not a party to this lawsuit, having assigned its various interests to Plaintiffs. (ECF No. 14 ¶¶ 11, 21 & Ex. D). Bruner Corp., together

---

[1] Plaintiffs state appropriately that, because Defendants seek dismissal of Counts One and Two, but not the remaining four, the motion is a Partial Motion to Dismiss.

1

with Defendants JWDC and KWC, are the founders and members of Defendant BMT. (*Id.* ¶ 8). Plaintiffs allege that Defendants have failed to pay Bruner Corp.'s accounts receivable, and they further claim, via the assignment, to stand in Bruner Corp.'s shoes with respect to its remedies.

### A. Project Mustang and Related Contracts

Defendant BMT, an Ohio Limited Liability Company, was created to perform the mechanical piping and HVAC work on the initial phase of Project Mustang, a large construction project in the Columbus, Ohio area. (ECF No. 16 at 2). BMT was formed when three mechanical contractors—non-party Bruner Corporation, Defendant JWDC, and Defendant KWC—entered into an Operating Agreement on May 31, 2019. (*Id.*; ECF No. 14 ¶ 8). Pursuant to the Operating Agreement, Bruner Corp. was the majority member with approximately 62% ownership interest; JWDC and KWC held the remainder. (*Id.*).

Plaintiffs' Amended Complaint sets forth a factually complex landscape with numerous contracts, amendments, and agreements executed between these parties and with Plaintiffs over the course of Project Mustang. Not all of the contracts described in the Amended Complaint are at play in this Motion to Dismiss. Besides the relevant contracts described below, others include: (1) BMT's Operating Agreement (Exhibit A to the Amended Complaint); (2) a Standard Form of Agreement Between Contractor [BMT] and Subcontractor [Bruner Corp.], concerning construction services and materials for Project Mustang (Exhibit B to the Amended Complaint); and (3) a Non-Disclosure Agreement between Bruner Holdings and JWDC (Exhibit J to the Amended Complaint). The four agreements that bear on Defendants' Motion to Dismiss are discussed below.

### 1. *Master Accounts Receivable Purchase and Security Agreement*

On October 4, 2019, Plaintiff CapPlus Construction and non-party Bruner Corp. entered into a Master Accounts Receivable Purchase and Security Agreement ("CapPlus Purchase

Agreement"), whereby CapPlus alleges that it purchased certain accounts receivable from Bruner Corp., including a number of accounts receivable under Project Mustang. (ECF No. 14 ¶ 10 & Ex. C). The specific accounts are identified in documents titled "Schedule of Purchased Accounts." These schedules were signed on October 28, 2019 ("Schedule #1005"), November 15, 2019 ("Schedule #1006), February 13, 2020 ("Schedule #1037"), March 24, 2019 ("Schedule #1052"), and December 15, 2020 ("Schedule #1096"). (*Id.* ¶ 16 & Ex. D). Plaintiffs also attach multiple letters and notices as evidence that BMT was informed of and acknowledged the assignments. (*Id.* ¶ 11 & Ex. D).

2. *Exit Agreement*

Plaintiffs allege that through January and February 2020, Defendant JWDC poached several of Bruner Corp.'s managerial staff who had been working on Project Mustang, thereby prompting non-party Bruner Corp. to enter the Project Mustang Exit Agreement with Defendant JWDC on February 25, 2020. (ECF No. 14 ¶¶ 12–13). This Exit Agreement is the subject of Plaintiffs' Count One.

Plaintiffs state that the purpose of the Exit Agreement was to: (1) close out Bruner Corp.'s subcontract with Defendant BMT; (2) issue a change order to JWDC to perform the balance of the subcontracted scope of work; and (3) compensate Bruner Corp. for the poaching in the amount of $1.5 million. (*Id.* ¶ 13). Per the Exit Agreement, Bruner Corp. became a non-voting member of Defendant BMT, and Defendants JWDC and KWC were each granted 50% voting rights. (*Id.*). The membership interest in BMT was restructured with Bruner Corp. having 33.33%, JWDC having 33.33%, and KWC having 33.34%. (*Id.*).

The Exit Agreement also included a section on payments to reconcile Bruner Corp.'s bills to BMT—for which some, if not all, of the accounts receivable had been assigned to Plaintiffs per

3

the CapPlus Purchase Agreement. (*Id.* ¶¶ 15–16 & Ex. E §§ 4, 5). Plaintiffs allege that BMT still owes Bruner Corp. (and therefore Plaintiffs, by assignment) $2,454,344.88 for February and March pay applications and $912,296.57 for retainage. (*Id.* ¶¶ 18, 41).

JWDC, KWC, and Bruner Corp. amended the Exit Agreement on March 4, 2020, to restructure the $1.5 million exit fee and to permit Bruner Corp to enter into the Subcontract Agreement with JWDC, detailed next. (*Id.* ¶¶ 14–15 & Ex. F).

### 3. Master Subcontract Agreement

In March 2020, non-party Bruner Corp. entered into a Master Subcontract Agreement ("Subcontract Agreement") with Defendant JWDC. (ECF No. 16-1, Ex. A). Plaintiffs state that Bruner Corp. performed the work required and abided by all other obligations under the Subcontract Agreement. (ECF No. 14 ¶ 20). Plaintiffs further allege that Defendant JWDC owes Bruner Corp. accounts receivable of $811,234.17 and retainage of $217,171.15 under the Subcontract Agreement. (*Id.*) Those payments have been assigned to CapPlus per the CapPlus Purchase Agreement. (*Id.* ¶¶ 20, 43).

### 4. Asset Purchase and Contribution Agreement

Plaintiffs allege that in March 2020, Plaintiff Bruner Holdings acquired non-party Bruner Corp.'s assets, including Bruner Corp.'s remaining accounts receivable from Project Mustang, via an Asset Purchase and Contribution Agreement ("Bruner Holdings Purchase Agreement"). (ECF No. 14 ¶ 21 & Ex. I). The Bruner Holdings Purchase Agreement assigned "all Contracts . . . other than the Excluded Contracts." (*Id.* Ex. I § 2.01(d)).

### B. The Instant Motion

After Defendants moved to dismiss the Complaint (ECF No. 13), Plaintiffs submitted an Amended Complaint (ECF No. 14), which Defendants again moved to dismiss (ECF No. 16). Of the six counts in Plaintiffs' Amended Complaint, only two breach of contract claims are the subject

4

of Defendants' Motion to Dismiss. (*Id.* at 1). Defendants argue lack of subject matter jurisdiction, improper venue, and failure to state a claim upon which relief can be granted. (*Id.*).

## II. STANDARD OF REVIEW

Before a court may determine whether a plaintiff has failed to state a claim upon which relief may be granted, it must first decide whether it has subject matter jurisdiction. *City of Heath, Ohio v. Ashland Oil, Inc.*, 834 F.Supp. 971, 975 (S.D. Ohio July 19, 1993). Rule 12(b)(1) provides that the defendant may file a motion to dismiss based on a lack of jurisdiction over the subject matter. The plaintiff has the burden of proving jurisdiction when subject matter jurisdiction is challenged. *Rogers v. Stratton Indus.*, 798 F.2d 913, 915 (6th Cir. 1986).

Under Federal Rule of Civil Procedure 12(b)(3), a party may move for dismissal of a case for improper venue. On such a motion, the plaintiff bears the burden of establishing that venue is proper. *Centerville ALF, Inc. v. Balanced Care Corp.*, 197 F. Supp. 2d 1039, 1046 (S.D. Ohio Mar. 2, 2002).

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint for a failure to state a claim upon which relief can be granted. To survive a motion to dismiss, "the plaintiff must allege facts that, if accepted as true, are sufficient to raise a right to relief above the speculative level . . . and to state a claim to relief that is plausible on its face." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)) (internal quotation marks omitted). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although the Court "must accept all well-pleaded factual allegations in the complaint as

5

true, we need not 'accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

### III. LAW & ANALYSIS

Defendants seek dismissal of Counts One and Two of the Amended Complaint pursuant to Rules 12(b)(1) for lack of subject matter jurisdiction, 12(b)(3) for improper venue, and 12(b)(6) for failure to state a claim. (ECF No. 16 at 1). Their core arguments pertain to a forum selection clause in the Exit Agreement (implicating venue) and the ability of Plaintiffs to enforce rights held by Bruner Corp. (implicating standing).[2] On Count One, Defendant KWC also argues under 12(b)(6) that Plaintiffs have not alleged sufficiently a breach.

Count One alleges breach of the Exit Agreement against Defendants BMT, JWDC, and KWC. (ECF No. 14 ¶¶ 36–41). Taking Plaintiffs' well-pled allegations as true, Defendant BMT failed to pay the disbursements due on the assigned receivables—$2,454,344.88 for February and March pay applications and $912,297.56 for retainage—contrary to the requirements of the Exit Agreement. (*Id.* ¶¶ 37, 41). Plaintiffs also state that CapPlus holds an assigned interest in the Exit Agreement and that Defendant BMT acknowledged this expressly. (*Id.* ¶ 37). Defendants move to dismiss Count One, alleging that the forum selection clause in the Exit Agreement deprives this Court of proper venue and that Plaintiffs have no contractual relationship with Defendants from which to allege a breach of contract.

Count Two, brought by CapPlus only against JWDC only, alleges that JWDC breached the Subcontract Agreement with Bruner Corp. Plaintiffs state that JWDC owes Bruner Corp. accounts receivable in the amount of $811,234.17 and retainage of $217,171.15, which have been assigned

---

[2] These arguments each include a brief claim sufficiency argument in the alternative. Defendants argue that, insofar as Plaintiffs have failed to plead proper venue and standing, they have failed to state a claim for relief. (ECF No. 16 at 4 nn. 1, 2). The Court's decisions on venue and standing will resolve Defendants' alternative arguments as well.

to CapPlus as reflected in the CapPlus Purchase Agreement and related Schedules. (ECF No. 14 ¶¶ 20, 43). In other words, Plaintiffs argue that CapPlus has an interest to pursue the rights and remedies available to Bruner Corp. under the Subcontract Agreement. (*Id.* ¶ 47). Defendants move to dismiss Count Two on the same main grounds as for Count One.

### A. Forum Selection Clause

Defendants assert that Plaintiffs' breach of contract claims must be litigated in state court due to the forum selection clause in the Exit Agreement. Specifically, Defendants argue that Plaintiffs are bound by the following contract provision:

> Each of the parties hereto, for themselves and their successors and assigns, hereby irrevocably consent to and submit to the exclusive personal jurisdiction and the sole exclusive venue *in the State or Superior Courts of Franklin County, Ohio*, in any action or proceeding arising out of this Agreement.

(ECF No. 14, Ex. E § 23 (emphasis added)).

Plaintiffs respond that this language is "black and white" and permits federal courts in Franklin County to retain jurisdiction over this suit. (ECF No. 20 at 4). When read in the disjunctive, the forum selection clause permits venue in State Courts in Franklin County *or* Superior Courts in Franklin County. This is the source of confusion, as Franklin County does not have a "Superior Court." "Superior Court" is, however, the name of the trial-level court in several other states (including California, Connecticut, Georgia, Maine, and Washington) and the District of Columbia; but there is no such thing as a "Superior Court" anywhere in the federal judiciary. Thus, the inclusion of "Superior Court" in the forum selection clause cannot evidence an intention to provide venue in the federal courts, this one included. Plaintiffs' attempt to read the forum selection clause as contemplating jurisdiction in the "federal/superior court in Franklin County" (*Id.*) is without support and contrary to the plain meaning of the clause.

7

Generally, "[a] forum selection clause should be upheld absent a strong showing that it should be set aside." *Wong v. PartyGaming Ltd.*, 589 F.3d 821, 828 (6th Cir. 2009) (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991)). The Supreme Court has held, however, that a forum selection clause may not be "enforced by a motion to dismiss under . . . Rule 12(b)(3) of the Federal Rules of Civil Procedure." *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for W. Dist. Texas*, 571 U.S. 49, 52 (2013). This is because Rule 12(b)(3) "allow[s] dismissal only when venue is 'wrong' or 'improper.' Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say nothing about a forum-selection clause." *Id.* at 55. "Instead, the Sixth Circuit has suggested that the proper mechanism for enforcing a forum selection clause that mandates jurisdiction in a state court is a motion to dismiss to enforce the clause premised on Rule 12(b)(6) or on the doctrine of *forum non conveniens*." *Bracken v. DASCO Home Med. Equip., Inc.*, 954 F. Supp. 2d 686, 693 (S.D. Ohio June 27, 2013) (citing *Wong*, 589 F.3d at 824, 830).

Defendants seek to enforce the forum selection clause through dismissal for improper venue under Rules 12(b)(3) and (b)(6). (ECF No. 16 at 4 n.2). Their main argument rests on Rule 12(b)(3); their (b)(6) argument rests on a footnote concerning mandatory arbitration clauses, which the court there analyzed as a jurisdictional defect under Rule 12(b)(1). *See id.* (citing *Nealy v. Shelly & Sands, Inc.*, No. 2:20-cv-1100, 2020 WL 4334890, at *2 n.1 (S.D. Ohio July 28, 2020)). A full argument under Rule 12(b)(6) would need to establish that "the forum selection clause is enforceable and applicable." *Bracken*, 954 F. Supp. 2d at 694. Neither is plainly true, since Plaintiffs were not parties to the Exit Agreement and, in some cases, were assigned the accounts receivable prior to its execution. (ECF No. 14 ¶¶ 10, 13). Since Defendants' (b)(3) motion is not the proper vehicle, Count One will not be dismissed based on the forum selection clause.

Defendants extend their argument under Rule 12(b)(3) to Count Two as well. They argue that Bruner Corp.'s right to receive payments under the Subcontract Agreement is governed by the Exit Agreement, including its forum selection clause. (ECF No. 16 at 7). Count Two survives this challenge for the same reasons as Count One.

### B. Privity of Contract

To maintain a cause of action for breach of contract, Ohio law requires privity of contract. *Mahalsky v. Salem Tool Co.*, 461 F.2d 581, 584 (6th Cir. 1972). Defendants argue that "none of the Plaintiffs are parties to the Exit Agreement . . . [or] the Subcontract Agreement" and ask for dismissal of Plaintiffs' Count One on this ground, too. (ECF No. 16 at 4–5). Though privity of contract ordinarily is established by being a party to the agreement, privity of contract also can be established "when a new party 'steps into the shoes' of an existing party to that agreement . . . . So, for example, an assignee to one party's interest in a contract would be in privity with the other parties to that assigned agreement." *Navarro v. Procter & Gamble Co.*, 515 F. Supp. 3d 718, 744 (S.D. Ohio Jan. 19, 2021). The dispositive issue is not whether Plaintiffs signed the Exit Agreement or the Subcontract Agreement, but whether they are valid assignees of Bruner Corp. with respect to those contracts.

*1. Enforcement of the Exit Agreement (Count One)*

Plaintiffs argue that privity of contract exists by virtue of Bruner Corp., not a party to this case, assigning to Plaintiffs its accounts receivable. Plaintiffs point to two agreements accomplishing the assignment: (1) the October 4, 2019 CapPlus Purchase Agreement between CapPlus Construction and Bruner Corp.; and (2) the March 14, 2020 Bruner Holdings Purchase Agreement between Bruner Holdings and Bruner Corp. (ECF No. 14 ¶¶ 10, 21). By virtue of these

9

agreements, Plaintiffs argue that they have privity of contract to enforce Bruner Corp.'s rights under the Exit Agreement for payment of those accounts receivable.

Under the CapPlus Purchase Agreement, Plaintiff CapPlus Construction purchased certain accounts receivable from Bruner Corp., including some under Project Mustang, which appear in the Schedules attached as Exhibit D to the Amended Complaint. (ECF No. 14 ¶¶ 10, 16). This agreement conferred on CapPlus Construction "the exclusive right to collect and receive all payments on all Purchased Accounts," and also authorized CapPlus Construction to notify debtors "of the assignment and purchase." (*Id.* Ex. C § 10). This was a valid assignment, enabling CapPlus to stand in the shoes of Bruner Corp. with respect to the accounts receivable.

Under the Bruner Holdings Purchase Agreement, Plaintiff Bruner Holdings "purchase[d]," and Bruner Corp. "assign[ed]," "all Contracts . . . other than the Excluded Contracts." (*Id.* ¶ 21 & Ex. I § 2.01). The purchased contracts included some accounts receivable from Project Mustang, which would have been reconciled under the Exit Agreement. (*Id.* ¶ 21). The Exit Agreement itself, however, was unambiguously identified in the Bruner Holdings Purchase Agreement as an "Excluded Contract." (ECF No. 16-1, Ex. B § 2.02(c) & Disclosure Schedules).[3] Even so, the only payment obligation *created* by the Exit Agreement was the $1.5 million that JWDC agreed to pay for alleged "poaching" of Bruner Corp. employees. (ECF No. 14 ¶ 13 & Ex. E § 4(a)). The Exit Agreement referenced other payments owed to Bruner Corp. for Project Mustang, which it reconciled under new billing and payment schedules; but the Exit Agreement is not the source of those obligations. Bruner Holdings could have purchased the accounts receivable that were

---

[3] Plaintiffs did not include the Disclosure Schedules, which identify the Exit Agreement as an "Excluded Contract," in their Exhibit I. The Court may consider the full contract, which Defendants attach as Exhibit B to their Response, because the contract is "referred to in the complaint and [is] central to the claims contained therein." *Basset v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). The Court admonishes Plaintiffs to exercise caution when excerpting "only relevant pages" (ECF No. 14 ¶ 21), especially where clauses are dependent on other sections of the contract.

10

reconciled in the Exit Agreement, without obtaining an assignment of the "Excluded Contract" itself. With respect to those accounts receivable assigned under the Bruner Holdings Purchase Agreement, Bruner Holdings likewise may stand in the shoes of Bruner Corp.

Ultimately, however, Plaintiffs must allege privity of contract *with respect to the Exit Agreement*. Count One is styled as "Breach of the Exit Agreement," and Plaintiffs' allegations are consistent with that framing. (*Id.* ¶¶ 36–41). Plaintiffs cannot enforce a contract to which they were not a party, unless privity was created through assignment. *See Mahalsky*, 461 F.2d at 584; *Navarro*, 515 F. Supp. 3d at 744. The privity Plaintiffs have established here is in whatever contracts generated the sums owed on the assigned accounts receivable—presumably the Standard Form of Agreement Between Contractor and Subcontractor (Exhibit B to the Amended Complaint) or Project Mustang work orders executed thereunder. Plaintiffs' bare allegation that the Exit Agreement was assigned (ECF No. 14 ¶ 37) need not be taken as true and is in fact belied by the contracts. The Exit Agreement cannot have been assigned via either the CapPlus Purchase Agreement (which predated the Exit Agreement by almost five months)[4] or the Bruner Holdings Purchase Agreement (which expressly excluded the Exit Agreement from the purchased contracts). Moreover, Defendants' purported acknowledgement of the assignment is premised on payments made to the assignor, not the assignee (*Id.* ¶ 18),[5] and on a letter notice concerning the Schedules, not the Exit Agreement. (*Id.* Ex. D).

---

[4] It is worth noting here that, contrary to the notice letters attached as Exhibit D to the Amended Complaint, the CapPlus Purchase Agreement did not assign "all the present and future accounts receivable of Bruner Corporation" (which could, in theory, reach the Exit Agreement). It allowed CapPlus to purchase specific accounts offered by Bruner Corp., as indicated on the Schedules. (ECF No. 14, Ex. C § 2). Indeed, if CapPlus had purchased *all present and future* accounts receivable, then there would be none remaining for Bruner Holdings to later purchase, and thus no basis for Bruner Holdings to be a Plaintiff. All Schedules, with the exception of Schedule #1096, coincided with specific pay applications of Bruner Corp. (*Id.* ¶ 16). Schedule #1096 related to accounts receivable under the Subcontract Agreement. (*Id.* ¶ 20). Therefore, neither the CapPlus Purchase Agreement nor any of the Schedules support an assignment of the Exit Agreement, as opposed to individual accounts receivable referenced within it.

[5] Plaintiffs are inconsistent on whether a $1 million partial payment by BMT was made to Bruner Corp. or directly to CapPlus. (ECF No. 14 ¶¶ 18, 28). But they do allege that other payments were made by BMT to Bruner Corp., after

The Court passes no judgment on whether Plaintiffs are owed money under the accounts receivable that were assigned to them. To have privity, Plaintiffs would need to sue under the contracts that are the source of their rights. Plaintiffs do not have any rights under the Exit Agreement because they are neither parties nor assignees to that agreement. They are at most creditors of Defendants on the assigned accounts receivable; and, as Defendants note, the Exit Agreement is clear that it creates no rights in creditors: "None of the provisions of this Agreement shall be for the benefit of or be enforceable by any creditor of the BMT or any creditor of BMT [sic] or any Member." (*Id.* Ex. E § 16; ECF No. 16 at 11).[6]

Accordingly, Plaintiffs lack the necessary privity of contract to enforce Bruner Corp.'s rights under the Exit Agreement. Defendants' Motion to Dismiss is **GRANTED** as to Count One.

*2. Enforcement of the Subcontract Agreement (Count Two)*

Defendants also argue that CapPlus is not a valid assignee of the Subcontract Agreement, meaning that Plaintiffs lack standing in Count Two. (ECF No. 16 at 11–12). Pursuant to Section 17.6 of the Subcontract Agreement, it cannot be assigned without the express written consent of Defendant JWDC. Section 17.6 states:

> Subcontractor [Bruner Corporation] shall not assign this Master Subcontract, or sublet all or any part of the Work, or assign all or any part of the monies due or to become due hereunder, without the prior written consent of Contractor [JWDC], and any attempted assignment, without such consent, shall be void.

(ECF No. 16-1, Ex. A § 17.6).[7]

Nowhere in Plaintiffs' argument do they allege that Defendant JWDC provided prior written consent for assignment of the Subcontract Agreement. Defendants expressly deny it. (*Id.*

---

the purported notice of assignment. (*Id.* ¶ 18). A $1.5 million payment by JWDC to CapPlus is closer to acknowledgement (*Id.* ¶ 28); however, Plaintiffs do not plead estoppel against JWDC in Count One.
[6] Relatedly, this clause precludes viewing Plaintiffs as intended beneficiaries of the Exit Agreement.
[7] Here too, the Court considers a document attached to Defendants' Motion to Dismiss. *See supra* note 3.

at 12). Plaintiffs do offer several letters and notices that purport to show BMT's acknowledgement of the assignment. (ECF No. 14 ¶¶ 11, 15 & Exs. D, H). But such notices would not amount to prior written consent by Defendant JWDC.

Without consent, the assignment is "void," and Plaintiffs have no right to stand in Bruner Corp.'s shoes under the Subcontract Agreement. Defendants' Motion to Dismiss is **GRANTED** as to Count Two.

### C. Factual Allegations of Breach

Defendants' final argument objects to the sufficiency of Plaintiffs' allegations against KWC in Count One. (ECF No. 16 at 10–11). Since the Court has already dismissed Count One in its entirety, this argument is moot.

### IV. CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** Defendants' Partial Motion to Dismiss. (ECF No. 16). Counts One and Two are **DISMISSED** without prejudice.

**IT IS SO ORDERED.**

_____
ALGENON L. MARBLEY
CHIEF UNITED STATES DISTRICT JUDGE

**DATED:  September 15, 2021**

13